# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# MONROE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CR. ACTION NO. 10-0200-01/02 |
| VERSUS | JUDGE ROBERT G. JAMES |
| ROBERT E. STEVENS AND ARTHUR GILMORE, JR. | MAG. JUDGE KAREN L. HAYES |

## RULING

Pending before the Court is a Motion to Reconsider Grant of New Trial ("Motion to Reconsider") [Doc. No. 193] filed by the Government. The Government moves the Court to set aside the portions of its September 14, 2011 Ruling and Order [Doc. Nos. 171 and 172], which vacated the convictions of Defendants Arthur Gilmore, Jr. ("Gilmore"), and Robert E. "Red" Stevens ("Stevens") and ordered that a new trial be held. For the following reasons, the Government's Motion to Reconsider is GRANTED.

## I.    RELEVANT FACTS AND PROCEDURAL BACKGROUND

In early 2008, local businessman, Eddie Hakim ("Hakim"), reported to the Louisiana State Police that Stevens and Gilmore had been soliciting bribes from him. The Louisiana State Police referred Hakim to the FBI, and an FBI investigation was initiated. In February 2008, with the help of the FBI and Louisiana State Police, Hakim began recording his conversations with each of the Defendants. *Id.*

While the FBI investigation and Hakim's cooperation continued, on or about October 29, 2009, Hakim's former employee, Blake Deshotels ("Deshotels"), and his attorney contacted the FBI and alleged that Hakim had committed tax fraud and evasion. The allegations were brought

to the attention of the Assistant United States Attorney ("AUSA") prosecuting this case, as well as the FBI case agent.[1]  After the FBI provided them with a telephone number, Deshotels and his attorney contacted an IRS supervisory agent, and the IRS opened a primary criminal investigation of Hakim.

On May 13, 2010, the IRS closed its primary criminal investigation, but did not refer the case to the civil division because of Hakim's status as an FBI cooperating witness.

The following month, on June 23, 2010, an Indictment issued, charging Stevens and Gilmore with one violation each of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) (Count 1) and the Hobbs Act, 18 U.S.C. § 1951 (Count 2).

On July 2, 2010, the IRS notified the AUSA that its primary criminal investigation of Hakim had been closed, but did not notify her that it had delayed referral of Hakim's case to the civil division.

After a number of pre-trial motions, a trial was held between April 27 and May 10, 2011. During trial, Hakim was the Government's primary witness.  The Government presented video and audio recordings of Hakim's meetings and conversations with each Defendant.  Hakim testified that Stevens and Gilmore had accepted bribes from him, detailed the nature of the bribes, and testified as to the content of the recordings.  Stevens and Gilmore took the stand in their own defense, disputed Hakim's interpretation of the recordings, denied that they had accepted bribes, and offered their own explanations of the recordings.

During cross-examination and through the presentation of their own witnesses,

---

[1]The Court has recounted the facts in this case in more detail in its Ruling on the Motion to Dismiss or for New Trial.  [Doc. No. 171].

Defendants attacked Hakim's credibility. Since they were unaware of the IRS investigation and Deshotels' allegations, Defendants did not raise these issues.

At the conclusion of trial, the jury returned guilty verdicts against both Defendants on Counts 1 and 2.

Following trial, Defendants timely filed post-trial motions seeking dismissal of the Indictment, a judgment of acquittal, or a new trial. In their "Motion to Dismiss or, Alternatively, for an Order Granting a New Trial" ("Motion to Dismiss or for New Trial") [Doc. No. 123],[2] Defendants argued that they were entitled to a new trial because the Government withheld discoverable evidence regarding Deshotels' allegations and the IRS primary criminal investigation of Hakim. In support of their motion, Defendants presented several exhibits, including Deshotels' affidavit and a letter from their expert, David Gunn ("Gunn"), a CPA and tax lawyer.

The Government filed an opposition memorandum, arguing that it was not required to disclose the IRS primary criminal investigation because it was closed on the merits, and Hakim was not informed of the investigation prior to or during trial. Additionally, the Government argued that Deshotels is not credible because he is a disbarred attorney who was sued by Hakim's company to recover funds loaned to him. Given the outcome of the investigation, the Government contended that Deshotels' allegations could only have been used as another attack on Hakim's credibility, and such evidence would have been cumulative. Finally, the Government argued that Deshotels' allegations were not newly discovered because Stevens'

---

[2]Defendants have adopted each other's motions numerous times throughout this case. For ease of reference, the Court refers to the motions as being filed by "Defendants," rather than differentiating which Defendant filed each motion.

counsel admits he knew about the allegations on the last day of trial, and many of the documents Defendants rely upon are part of the public record.

On August 15, 2011, the Court held a hearing on Defendants' Motion to Dismiss or for New Trial. The parties did not present witnesses, but stipulated to the testimony that the witnesses would have given. The Court also granted leave to Stevens to have his expert, Gunn, convert his letter report to an affidavit.

On August 18, 2011, Gunn's affidavit was filed in the record. [Doc. No. 159].

On August 25, 2011, Gilmore filed a Supplemental Motion for New Trial with supporting memorandum. [Doc. No. 160]. The same day, Stevens filed a Supplemental Memorandum in Support of his Motion to Dismiss or for New Trial. [Doc. No. 162].

On September 1, 2011, the Government filed its response in opposition to Gilmore's Supplemental Motion for New Trial and as a supplemental response to Stevens' Motion to Dismiss or for New Trial. [Doc. No. 164].

On September 14, 2011, the Court issued a Ruling and Order [Doc. Nos. 171 and 172], granting Defendants' Motion to Dismiss or for New Trial in part. The Court rejected the Government's arguments that Stevens had failed to timely raise the issue of Deshotels' allegations. The Court then concluded that the Government had violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose evidence favorable to the defense, that the evidence was material, and that Defendants did not receive a fair trial in the absence of this evidence; thus, the Court vacated Defendants' convictions and ordered a new trial.[3]

On October 26, 2011, the Government filed the pending Motion to Reconsider. [Doc.

---

[3]The Court otherwise denied Defendants' post-trial motions.

No. 193].

On November 28, 2011, Stevens filed a Response to the Government's Motion to Reconsider Grant of New Trial. [Doc. No. 207].

On December 12, 2011, the Government filed a reply memorandum. [Doc. No. 211].

On January 11-12, 2012, the Court held a hearing on the Government's motion. At that time, the Government presented testimony from (1) Myra Hale, an employee of the Hakim company, Control Services; (2) David Moses, an employee of Control Services, a family friend of the Hakims, and the person to and from whom alleged improper property transfers were made; (3) Hakim; (4) Joseph Hakim, Hakim's brother and an employee of Control Services; (5) Joe D. Guerriero, Hakim's in-house counsel; (6) Steve Pickering, Hakim's in-house accountant; (7) Bubba Via, Hakim's outside accountant; (8) Jay Hopper, Moses' friend and local restauranteur; and (9) IRS Agent Jude Armand. Defendants did not present any witnesses. At the conclusion of the hearing, the Court took the Government's Motion to Reconsider under advisement.

On January 17, 2012, with leave of Court, the Government filed a supplemental affidavit from Agent Armand. [Doc. No. 222].

## II.    LAW AND ANALYSIS

Although the Federal Rules of Criminal Procedure do not provide for a motion to reconsider, courts have recognized that a motion to reconsider or a petition for rehearing is procedurally appropriate when the Court's order affects final judgment. *See United States v. Cook*, 670 F.2d 46, 48 (5th Cir. 1982) ("Although a petition for rehearing of a district court order affecting final judgment is nowhere explicitly authorized in the Federal Rules of Criminal Procedure it is undoubtedly a legitimate procedural device. The Supreme Court has repeatedly

and expressly sanctioned the use of motions for reconsideration in criminal proceedings.")
(citations omitted).

The Government moves the Court to reconsider those portions of its September 14, 2011
Ruling and Order vacating Defendants' convictions and ordering a new trial. In the September
14, 2011 Ruling, the Court found that the Government agents involved in Defendants'
prosecution had "shield[ed] themselves" from full knowledge of Deshotels' allegations against
Hakim and, as a result, had "actual or constructive possession of sufficient information to know
that [they] had a duty to disclose favorable evidence to Defendants." [Doc. No. 171, p. 39]. This
"[e]vidence of Deshotels' allegations and the IRS primary investigation would not have been
cumulative of the other impeachment and bad reputation evidence offered against Hakim
[because it] completely undercuts his portrayal of himself of an honest businessman seeking to
right a wrong." *Id.* at pp. 39-40.

> The undisclosed information also demonstrates that Hakim had a reason to be
> biased, and the jury was improperly denied the opportunity to consider that bias . .
> . . [Hakim] was certainly aware of his own conduct in transferring property to an
> employee and then having that employee transfer the property back to Hakim, his
> two brothers, and another Hakim entity [the so-called Section 1031 transfer].
> Thus, Hakim had motivation to assist the FBI with an investigation into public
> bribery and to deflect attention from himself. Defendants would have been able to
> offer extrinsic evidence of this bias at trial.

*Id.* at pp. 40-41. Finally, as a result of the Government's failure to disclose the information and
evidence, Defendants were denied the opportunity to effectively cross-examine Hakim about his
receipt of a benefit "of not having a personal or company audit performed by the IRS" and the
possible benefit of "keeping a large sum [of] money which he and his companies were obligated
to pay to the IRS." *Id.* at p. 41. Ultimately, "[g]iven the Government's reliance on Hakim's
testimony and Defendants' defense of attacking Hakim's credibility, the Court [could not] say

with confidence that Stevens and Gilmore received a fair trial in the absence of evidence of the

Deshotel[s] allegations, the IRS primary investigation, and the benefit conferred on Hakim by the

IRS." *Id.* at p. 42.

For purposes of its Motion to Reconsider, the Government does not challenge the Court's

finding that *Brady/Giglio* was violated because the Government failed to disclose evidence

favorable to the defense.[4]  Rather, the Government urges the Court to reconsider its Ruling

because the Government has now proven that the evidence was not material, and there is no other

basis for a new trial.  First, the Government contends that Deshotels' allegations have been

proven untrue.  Second, the Government contends that Defendants cannot use the existence of

the IRS investigation to impeach Hakim because he was unaware of the investigation.  Third, the

Government contends that Defendants cannot show Hakim was biased or motivated to help the

FBI to deflect attention from himself when he was acting on the advice of his accountants.

Fourth, Hakim did not receive a benefit from the IRS's failure to refer his case to the civil

division because the general three-year statute of limitations for a civil audit had already run.

Although the Government admits that Agent Armand's investigation has now uncovered

evidence that Hakim did not pay taxes on a portion of the proceeds received from the sale of

---

[4]*See Brady*, 373 U.S. at 87 (The Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."); *Giglio v. United States*, 405 U.S. 150, 154 (1972) (The Supreme Court extended the *Brady* duty to include material evidence "affecting" the credibility of a witness); *see also United States v. Johnson*, 872 F.2d 612, 619 (5th Cir. 1989) (Under *Brady/Giglio*, the Government must give the defense impeachment and exculpatory evidence.).

property in Houston, Texas, the Government contends that this is newly discovered evidence, but the evidence does not justify a second trial.

Defendants respond, first, that the Government should not be permitted to re-argue the granting of a new trial when this evidence was available prior to the Court's Ruling. Defendants respond further that Deshotels' allegations were merely the catalyst for their motion. Defendants contend that the evidence is sufficient to show that Hakim was aware of the requirements for a Section 1031 exchange, that he was aware of his fraudulent property transfers to and from Moses, and thus he was motivated to ingratiate himself with the Government. If Hakim, through his companies, fraudulently transferred the properties to and from Moses, then the three-year limitations period is inapplicable, and Hakim received a benefit. Finally, even if the property transfers to Moses were legitimate, the evidence now shows that the Hakims testified falsely at trial about the Sherrouse Plantation subdivision development. At best, Defendants contend that the Government's arguments provide a basis for a motion in limine, not its Motion for Reconsideration.

Initially, the Court finds that it is appropriate to address the Government's Motion to Reconsider. Given the posture of the case prior to the Court's Ruling, the Government's response was appropriate at the time. The Court will now consider whether its decision to order a new trial is still in the interest of justice in light of all evidence presented.

### A. Materiality of the *Brady* Violation in Light of the Additional Evidence

When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within th[e] general rule [of Brady ]. We do not, however, automatically require a new trial

> whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict . . . . A finding of materiality of the evidence is required under Brady . . . .

*Giglio*, 405 U.S. at 154 (citations and internal quotation marks omitted). Evidence is "material," i.e., prejudicial, when there exists a "reasonable probability" that had the evidence been disclosed, the result at trial would have been different. *Banks v. Dretke*, 540 U.S. 668, 698-99 (2004); *see also Miller v. Dretke*, 404 F.3d 908, 913–16 (5th Cir. 2005).

### 1. Deshotels' Allegations Not Relied Upon by the Court

At the time of the Court's Ruling, Deshotels had made three allegations: (1) that Hakim and his family had donated small interests in one of their companies, Penny Realty, Inc. ("Penny Realty"), to their children using a fraudulent basis in the property to avoid payment of gift tax; (2) that Hakim, his attorney, and his accountant set up shell companies and used other means to help Deshotels avoid a tax lien and child support obligations and to help another employee avoid her child support obligations; and (3) that Hakim and his family employed multiple, improper property transfers to defer capital gains tax on the 2005 sale of the Houston property.

The Government presents undisputed evidence that the first two allegations are untrue. First, Penny Realty is owned by the wives and children of the three Hakim brothers, Eddie, Joseph, and Jack. Hakim and his wife have a separation of property agreement. Although Hakim's wife donated some of her interests in Penny Realty to their children, there was no evidence presented that the interests were undervalued. Second, the Government presented evidence that neither Hakim nor his employees helped Deshotels or another employee avoid their legal obligations. Hakim actually loaned Deshotels money to pay his child support settlement

9

amount and later sued Deshotels to recover this money. Hakim's company deducted child

support payments from the earnings of the other employee whom Deshotels identified. The

Court agrees that there is no evidence supporting these two allegations, but the Court did not rely

on Deshotels' first two allegations in its decision to vacate Defendants' convictions and grant a

new trial. Therefore, this evidence is insufficient to support the Government's Motion to

Reconsider.[5] The Court did, however, rely on Deshotels' allegations, the Gunn affidavit, and

other evidence related to the 2005 sale of property in Houston. The Court now turns to

consideration of the evidence on that sale.

## 2.    Section 1031 Transactions

Prior to the Court's September 14, 2011 Ruling, the Government did not challenge

Deshotels' allegations regarding Hakim's 2005 sale of property in Houston. Deshotels averred

that "sometime around 2005" a Hakim company, which he believed was named "Corridors 1 or

Corridors 2 Properties, LLC," sold property in Houston to an investment firm in Philadelphia.

Deshotels further averred that the value of the property had been written down, so that Hakim

should have had substantial taxable gains, but that Hakim "used multiple fraudulent property

transfers to evade the capital gains tax of over $2,000,000.00." [Doc. No. 123, Deshotels

Affidavit ("Deshotels Aff."), p.3]. More specifically, Deshotels averred that the Hakim family

"took the majority of their property in Ouachita Parish including the farm at LoneWa, the

---

[5]The Court is aware that the Government presented this evidence to show that Deshotels is
unworthy of belief. However, the Court noted in its previous Ruling that Deshotels' credibility
was subject to attack because he is a disbarred attorney who stole or mishandled client funds, and
the Government could also attack his motive as a disgruntled former employee of Hakim.

Sherrouse Plantation Development property, the building on St. Charles and the old K-Mart building and 'sold' it to an employee named David. L. Moses." [Doc. No. 123, Deshotels Aff., p. 3]. Deshotels knew "for sure that David Moses did not sign contemporaneously with the transfer any note to the Hakims. Moses then 'sold' the property back to the Hakim brothers and Penny Realty." [Doc. No. 123, Deshotels Aff., p. 3].

Relying on Deshotels' averments and other evidence, Defendants' expert, Gunn, averred that Hakim had apparently attempted to structure a tax-deferred exchange of property under Section 1031 of the Internal Revenue Code.[6] Gunn opined that the attempted Section 1031 exchange was invalid if (1) Corridors 1 or Corridors 2, LLC, owned the Houston property, and the exchange property was purchased by the Hakim brothers and Penny Realty; **or** (2) the exchange property had been fraudulently transferred to and from Moses. If the Section 1031 exchange was invalid for either reason, Gunn opined that Hakim would have owed significant federal income tax, which he estimated to be in the $2-3 million range.

The testimony and evidence which has now been submitted to the Court demonstrate that

---

[6] Internal Revenue Code § 1031(a)(1) states:

No gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment.

Thus, a taxpayer may sell investment or business property for a profit, but defer recognition of the capital gains tax by purchasing "like kind" property. In a deferred like-kind exchange, the like-kind property is not simultaneously exchanged. The Internal Revenue Code requires that the replacement property be identified within 45 days and received within 180 days after "transfer of the relinquished property." I.R.C. § 1031(a)(3).

Corridors 1 or Corridors 2 is not a Hakim entity which owned property in Houston.  Rather, in 1993, the Hakim brothers and Penny Realty purchased property in Houston, which was **named** Corridors I and II, for $3,000,000.  By 2005, the Houston property's value had been written down to  $1,639,514.34, and the Hakims anticipated a significant profit on a sale.  Several months before June 2005,[7] Hakim and Via discussed the sale, and Via explained Section 1031.  On Via's recommendation, the Hakim brothers and Penny Realty decided to use a Section 1031 exchange to defer the capital gains tax on the sale of the Houston property.

On May 3, 2005, Northeast Realty, LLC, a Hakim company, purportedly sold by cash deeds two pieces of property in the Sherrouse Plantation subdivision development to Moses.  The stated purchase price for 4500 Desiard Street was $998,929, the same price Northeast Realty had paid for the property on September 30, 2004.  Likewise, Moses purportedly purchased 5204 Desiard Street for $480,000, the same price Northeast Realty had paid for that property on September 30, 2004.  The cash deeds of sale for both of the Desiard Street properties were purportedly signed on May 3, 2005, by Joseph Hakim as Member/Manager of Northeast Realty, but were never signed by Moses and were not recorded in the conveyance records of Ouachita Parish until November 4, 2005.  Cash consideration was not paid to Northeast Realty, and there are no promissory notes,  mortgages, letter agreements, or any other financing documentation on these sales.

Quail Realty, Inc., another Hakim company, purportedly sold by cash deed a piece of

---

[7] It is unclear exactly when Via and Hakim first spoke about a potential sale of the Houston property, but Via was clear that he had spoken with Hakim several months before the sale.

property at Keystone Road and Highway 165 in Sterlington, Louisiana, to Moses for $133,000.

The act of sale for this property was purportedly signed on May 12, 2005, by Steve Pickering as

Vice President of Quail Realty, but was never signed by Moses and was not recorded in the

conveyance records of Ouachita Parish until January 11, 2006.  Cash consideration was not paid

to Quail Realty, and there is no promissory note,  mortgage, letter agreement, or any other

financing documentation on this sale either.

The following month, on June 27, 2005, the Hakim brothers and Penny Realty sold the

Houston property for $11,000,000.   Sale proceeds were deposited with a qualified intermediary,

Land America.  Within 45 days of the transfer of the Houston property, the Hakim brothers and

Penny Realty identified the replacement property they intended to purchase: the three pieces of

property sold to Moses the month before and two additional pieces of property in Ouachita

Parish, which were also owned by Moses.  The two additional pieces of property were

1901 Louisville Avenue in Monroe, a former used car lot adjacent to The Brandy House

restaurant and Atrium Hotel (owned by the Hakims), and 111 Constitution Drive, the old K-Mart

building in West Monroe.  Moses had purchased the parking lot on April 30, 2004, from

American Horizons Bank for $1,582,317 with 100% financing from Luv N' Care, Ltd., a Hakim

company.  The deed of sale for this property was signed by an agent for American Horizons Bank

and by Moses on April 30, 2004, and was recorded in the conveyance records of Ouachita Parish

on the same date.  Moses also purchased 111 Constitution Drive by cash sale from I-20 Corridor

Properties, LLC, a Hakim company, for a recited cash consideration of $5,275,000.  The deed of

sale for this property was purportedly signed on January 25, 2005, by Joseph Hakim as

Member/Manager of I-20 Corridor, but was never signed by Moses and was not recorded until November 4, 2005. Cash consideration was not paid to I-20 Corridor, and there is no promissory note, mortgage, letter agreement, or any other financing documentation on this sale.

At the hearing on the pending motion, Moses, Hakim, and Joseph Hakim testified that the five properties had been legitimately sold to and/or financed for Moses. Hakim explained that he wanted to help Moses become a developer because of the extremely close relationship between the Hakim and Moses families and the fact that Moses' grandfather had been Hakim's business mentor. Moses testified that he had development plans for each of the properties. On the parking lot at 1901 Louisville Ave., he intended to put in a Chick-Fil-A restaurant, but learned after the purchase that he would be unable to get a franchise. At 111 Constitution Drive, he intended to put in a Chuck E. Cheese and a bowling alley. At 4500 Desiard Street, Moses intended to construct multiple ballfields and concession stands on two of the lots. At 5204 Desiard Street, Moses intended to improve the existing trailer park and put in additional lots. Finally, at Keystone Road and Highway 165, he intended to put in a restaurant. Moses' longtime friend and local restauranteur, Jay Hopper ("Hopper"), testified that Moses had shown him the property at Keystone Road and Highway 165 with the idea that Hopper could put in a seafood restaurant, but Hopper was not interested.

Other than Hopper's testimony, there is no evidence to support the testimony of the Hakims and Moses that Moses intended to develop these properties.[8] Moses never entered into

---

[8]Moses explained that he did not have any evidence because these transactions took place six years ago.

any agreements or contracts to develop any of the properties and never actually began development on any of the properties. While Moses was record owner, he never made payments on any of the properties, and the Hakims continued to pay all taxes on the properties.

After the sales to Moses, the Hakims also treated several of the properties as their own. The Hakims re-paved the lot at 1901 Louisville,[9] which was used for parking by employees of the Brandy House and Atrium Hotel. Although Hakim and Moses testified that they orally agreed for Moses to pay for one-half of the paving after Moses developed the property, there is no notation in the financial records of Luv N' Care of this agreement. In addition, the Hakims had reached the design stage of expansion of the restaurant and hotel with plans which included Moses' parking lot. The Hakims continued to collect the rents from the trailer park at 5204 Desiard Street. Although the Hakims described their collection of rents from the trailer park as offsets to Moses' debt[10], no notations of these offsets were contained in the financial records of Northeast Realty, the entity which was the seller of, and provided the financing for, Moses' purchase of the Desiard Street properties. At 4500 Desiard Street, the Hakims used the house located on the property for offices. The Hakims again described the use of the house as an offset to Moses' debt, but there was no notation of this offset either. Prior to selling 4500 Desiard

---

[9]When Moses purchased 1901 Louisville Avenue, it was a field and had a slab where the former car lot had been located. Before and after Moses' purchase, Atrium and Brandy House employees parked on the lot.

[10]Moses testified that he would have owed "interest" on the loans for the purchase of 4500 and 5204 Desiard, so the Hakims collected the trailer park rents and used the house as an office. Moses noted that he was only developing lots 2 and 3, not lot 5 where the house at 4500 Desiard was located.

Street, the Hakims had filed suit against the owners of neighboring property, contending that their alleged encroachment was interfering with the development of the Sherrouse Plantation subdivision. The Hakims continued to pursue this lawsuit even after 4500 Desiard Street was sold to Moses. Hakim's in-house counsel, Joe D. Guerrerio, explained that he had continued with the lawsuit because he was not advised of the sale to Moses.[11]

On January 13, 2006, within 180 days of the transfer of the Houston property, the Hakim brothers and Penny Realty completed the Section 1031 transfer.

After Moses transferred the properties to the Hakim brothers and Penny Realty, Land America sent Moses a check for a total of $8,469,246. Moses deposited the check into a business account and wrote checks to Northeast Realty, I-20 Corridors, Quail Realty, and Luv N' Care, totaling the same amount: $8,469,246. At the end of these transactions, the Hakim brothers and Penny Realty had $11,000,000 in cash and property valued at $8,469,246. Yet neither Moses, the Hakims, nor the Hakim companies have paid taxes related to these property transfers.

Since January 2006, neither the Hakims nor their companies have sold any commercial property to Moses for development. The Hakims gave Moses a lot in one of their subdivisions with the understanding that he will repay them when he sells the home located there. Two weeks before the hearing in this Court, Hakim also loaned Moses $12,500 toward the purchase of a rent house.

---

[11]The fact remains that the Hakims continued to pursue a lawsuit regarding 4500 Desiard Street in the name of Northeast Realty from May 2005 through January 2006 and, even then, Hakim's own counsel was unaware that the property was again transferred to the Hakim brothers and Penny Realty. The Hakim brothers and Penny Realty were not substituted as proper parties until August 2006.

In spite of the evidence suggesting that some of the transactions were shams, in spite of the evidence suggesting that Moses was a strawman, and in spite of the fact that taxes were not paid on millions of dollars of capital gains, the Government's expert witness, IRS Agent Armand, testified at the hearing that he found no intent by Hakim to commit tax fraud or evasion. Agent Armand, who has been a CPA since 2002 and an IRS Agent since 2004, is not a case agent in this matter, and he was not assigned by the IRS to conduct an "official" audit or investigation. Rather, at the request of the Government, the IRS authorized him to give his opinion on Hakim's tax implications for 2005 and 2006. Agent Armand had never investigated a Section 1031 transaction before this time, and he admitted he had some concern that Moses was an employee of the Hakim company, Control Services. However, he found no tax code provisions which barred the Hakim brothers and Penny Realty from purchasing replacement property from an employee. For purposes of his tax computation, Agent Armand considered it irrelevant that the Hakim companies fully financed Moses' purchase of the same properties he later sold to the Hakim brothers and Penny Realty. Agent Armand admitted that he would have preferred to find promissory notes, mortgages, or some documentation of sales terms in the records of the Hakim companies. Agent Armand also admitted that it was odd that the Hakims continued to collect the rents from the trailer park at 5204 Desiard and use the offices at the house at 4500 Desiard while Moses owned the property. Nevertheless, he concluded there was no evidence of a scheme to defraud.

Agent Armand also testified that Moses had not constructively received the proceeds of the Houston sale as an agent for the Hakims, which would have invalidated the Section 1031

exchange. Agent Armand agreed with Defendants' expert, Gunn, that an employee can serve as his employer's agent, but the employee does not act as an agent if he receives sales proceeds for himself.[12] In this case, based on the facts, Agent Armand concluded that Moses received the proceeds for himself, rather than for the Hakims. The Hakim brothers and Penny Realty completed their Section 1031 exchange when they purchased the five properties from Moses. Moses then transferred or conveyed the five properties to the Hakim brothers and Penny Realty, and they paid him, through Land America, the purchase price of $8,469,246 . Finally, Agent Armand testified that Moses' actions in writing checks from his business account in the total amount of $8,469,246 to the Hakim companies, Northeast Realty, I-20 Corridors, Quail Realty, and Luv N' Care, was a subsequent repayment of the debts owed to those companies and was not part of the Section 1031 exchange. To reach his conclusions, Agent Armand testified that he had found the Hakims' and Moses' testimony and their explanations of the transactions to be "true without question." Therefore, in his opinion, Hakim had not engaged in criminal conduct, nor was he subject to civil penalties based on the circumstances of the Section 1031 transaction.

During his review, Agent Armand uncovered evidence which the IRS primary criminal investigation had overlooked: that Hakim failed to pay taxes on his portion of the difference between the sale price of the Houston property (of $11,000,000) and the purchase price of the properties from Moses (of $8,469,246). Agent Armand determined that Hakim's portion of the

___

[12]Agent Armand testified that he had reviewed examples of constructive receipt in IRS publications and found the facts in this case to be dissimilar. He explained a typical example where an employee works in a company's accounts receivable section and receives a check for the company.

proceeds from the sale was $614,879.55, and Hakim owed taxes on this amount. However,

Agent Armand testified that the IRS could not require Hakim to pay these taxes because the

general three-year statute of limitations had already run before Deshotels came forward.

Agent Armand admitted that there were exceptions to the three-year statute of limitations,

but concluded that none of the possible exceptions applied. First, he concluded that the

exceptions for the intentional filing of a false return or the willful attempt to evade tax did not

apply.[13] According to Pickering, Hakim's in-house accountant, Hakim had set aside money in

certificates of deposit to pay the taxes he owed on his portion of the Houston sale proceeds.[14]

However, despite the reminder of the certificates of deposits, Pickering still failed to report

Hakim's sizable income on the Houston sale to Via. Based on Pickering's admission, Agent

Armand found no evidence that Hakim intentionally filed a false return or willfully attempted to

commit tax evasion. Second, Agent Armand concluded that the exception for the substantial

omission of income did not apply either. Under this exception, there is a six-year statute of

limitations if a taxpayer under reports his income in an amount that exceeds 25% of his gross

receipts.[15] Based on the information provided by Pickering, Agent Armand performed

calculations and concluded the unreported portion of Hakim's income was less than 25% of his

gross receipts for the year. Thus, Agent Armand also found that the IRS could take no action

---

[13]If a taxpayer filed a "false or fraudulent return with the intent to evade tax," or engaged in "a willful attempt in any manner to defeat or evade tax," then there is no civil statute of limitations, and tax may be assessed "at any time." 26 U.S.C. § 6501(c)(1)-(2).

[14]Copies of the certificates of deposit were produced.

[15]26 U.S.C. § 6501(e)(1)(B)(I).

against Hakim based on this evidence.[16]

During the hearing, Via was cross-examined on these transactions, not in his capacity as Hakim's accountant, but based on his ten years of experience as an IRS agent. As an agent, Via admits he would have questioned the close timing between the Hakims' selling of three properties to Moses and their identification, only one month later, of the same three properties as part of the Section 1031 exchange. He also would have questioned Moses' lack of financial ability to buy the properties; his position at Control Services performing odd jobs, which included driving the Hakim children to activities; his failure to make any payments; and the lack of financing documentation.

Based on the testimony of its witnesses, the Government contends that all of Deshotels' allegations are false, and the Court can no longer rely on those allegations to justify a new trial. Now that the Government has challenged Deshotels' characterization of the property transfers, the Court agrees that it cannot accept those characterizations as true, as it did in its September 14, 2011 ruling, but must consider all the evidence.

After viewing the expanded record before it, the Court finds that a number of Deshotels' allegations were proven correct. The Hakims did sell property in Houston in 2005, the property had been written down in value, and the Hakims were facing large capital gains tax. Further, Deshotels was correct that the Hakim family had transferred property in Ouachita Parish to Moses, including the pivotal Sherrouse Plantation Development subdivision property and the old

---

[16]Agent Armand did not analyze the tax implications for the Hakim brothers, Penny Realty, or the other Hakim entities involved in these transactions. Accordingly, it is unknown whether the Hakim brothers or the related entities have civil tax liability.

K-Mart building.  Although Deshotels incorrectly alleged that the Hakims transferred Lone Wa

farm to Moses, the Hakims trasferred property to Moses that was directly across the

road/highway from LoneWa farm.[17]  Deshotels was correct that Moses did not sign any note to

the Hakims (or other financing documentation).  Deshotels was correct that Moses sold the

properties he purchased from Hakim companies back to the Hakims.  Deshotels was correct that,

as a result of these actions, the Hakims did not pay capital gains tax on the sale of the Houston

property for $11,000,00.  Much of the circumstantial evidence still supports Deshotels'

allegations that Hakim and his family employed improper property transfers to defer the payment

of capital gains tax.

In spite of the evidence to the contrary, however, the Government's expert, Agent

Armand, opines that there is insufficient evidence to find that Hakim, when relying on the advice

of his accountants, acted willfully and intentionally to file a false return or to evade the payment

of taxes.  According to Agent Armand, with support from Via, the Section 1031 exchange was

valid.  Therefore, the only tax implication for Hakim[18] is based on his mistaken failure to pay

taxes on his portion of the difference between the proceeds from the sale of the Houston property

and the purchase of the properties from Moses.  Agent Armand opines that even this mistake is

without consequence because the statute of limitations for the collection of the taxes under the

---

[17]The LoneWa farm is located on the northwest corner of Keystone Road and Highway
165.  The property sold to Moses is located on the southeast corner of Keystone Road and Highway
165. [Doc. No. 211, p. 7, Exh. 2].

[18]His brothers and Penny Realty also apparently failed to report the income, but that
evidence is not definitively before the Court.

civil provision has run.

Based on the conflicting evidence, the Court is faced with the difficult task of determining if a new trial is warranted. Despite the many hours the parties and the Court have devoted to the question of Hakim's tax activities, the Court's role is not to determine as a matter of law whether Hakim committed civil or criminal violations of the tax code. The Court's role is limited to a determination whether the Government's *Brady* violation resulted in the suppression of material evidence.

In its Ruling on Defendants' Motion to Dismiss or for New Trial, the Court concluded that evidence of Hakim's alleged fraudulent tax activities was material, in part, because Hakim's knowledge of his own activities provided motivation for him to assist the FBI. The Court further concluded that Deshotels' allegations and the IRS primary criminal investigation provided an additional basis for attacking Hakim's credibility and reputation. Those determinations no longer stand. While the Court may question the validity of the Section 1031 exchange, Hakim had no motivation to assist the FBI if he had no reason to fear consequences as a result of the Section 1031 exchange. If the IRS cannot find that Hakim engaged in intentional wrongdoing, in part because Hakim acted on the advice of his accountant, a former IRS agent, then Deshotels' allegations are just a cumulative attack on Hakim's credibility and reputation, this time by a disgruntled former employee, instead of adversarial political figures.

Further, Defendants did not suffer a due process violation because of the Government's failure to disclose the IRS's delay in referring Hakim's case to the civil division. The Government's suppression of evidence favorable to a defendant, including evidence that may be

used to impeach a witness' credibility, constitutes a due process violation. *See Blackmon v. Johnson*, 145 F.3d 205, 208 (5th Cir.1998), *cert. denied*, 119 S.Ct. 1258 (1999). A promise of leniency made to a key witness in return for his testimony is impeachment evidence to which a defendant is entitled. *See Giglio*, 405 U.S. at 154-55. Likewise, the Government has a duty to correct testimony which its knows or should have known was false and which reasonably could have affected the judgment of the jury. *See Blackmon*, 145 F.3d at 208. In this case, Hakim testified that no one with the State Police, the FBI, the U.S. Attorney's Office, or state district attorney's office had made him any promises or given him any assurances as to whether he might be prosecuted for giving bribes. Since neither the AUSA nor the FBI made a promise of leniency to Hakim or knew that Hakim received any benefit from the IRS, there was no due process violation.

The Court is disturbed that the IRS chose to delay a civil audit of Hakim because of his status as an FBI witness and apparently had no intention of conducting a civil audit of his brothers or Penny Realty. However, given the evidence now before the Court, at worst, the IRS would have discovered that the statute of limitations had run on Hakim's failure to pay taxes on his portion of the difference between the price of the sale of the Houston property and the purchase of the Section 1031 exchange property. This does not justify a new trial.

Finally, the Court turns to Defendants' remaining argument that, if the property transfers to and from Moses were legitimate, the Government's *Brady* violation resulted in the suppression of material evidence because Hakim and Joseph Hakim testified falsely about their development of the Sherrouse Plantation subdivision. The Court disagrees.

Defendants do not specifically allege a so-called *Napue* violation–that the Government

knowingly used false testimony.  *See United States v. Wall*, 389 F.3d 457, 472 (5th Cir. 2004)

("The knowing use of false testimony is commonly referred to as a *Napue* violation after the

Supreme Court's opinion in *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217

(1959)").  "[I]f the government used false testimony that it knew **or should have known** was

false," then the United States Court of Appeals for the Fifth Circuit applies a "slightly more

lenient" version of the standard applied for newly discovered evidence.  *Id.* at 472-73 (emphasis

added) (citation omitted). "[T]his standard requires a finding that the testimony in question was

'actually false.'"  *Id.* at 473 (citing *United States v. Chagra*, 735 F.2d 870, 874 (5th Cir. 1984);

*United States v. Antone*, 603 F.2d 566, 571 (5th Cir. 1979)).  The defendant must further

demonstrate that "(1) the evidence was unknown to [him] at the time of trial; (2) [his] failure to

learn of the evidence was not due to a lack of diligence; (3) the evidence is material, not merely

cumulative or impeaching"; and (4) "there is any reasonable likelihood that the false testimony

affected the judgment of the jury."  *Id.* (emphasis deleted) (citation omitted).  Thus, whether

Defendants allege a *Napue* violation or whether their claims are analyzed under *Giglio*, a new

trial is not warranted unless the excluded or suppressed evidence is material.

   The Indictment alleged that, as one of his four acts of racketeering,  Gilmore agreed to

help Hakim "with specific matters coming before the City of Monroe" in return for a "reduced

purchase price" for a lot in the undeveloped Sherrouse Plantation subdivision. [Doc. No. 1, pp. 5-

6].  Joseph Hakim testified that the Sherrouse Plantation subdivision had been in development

since the late 1990s.  The Hakim brothers pointed to the purchase of the two pieces of Desiard

Street property on September 30, 2004, as the beginning of the land acquisition for the

development, but they were still acquiring land at the time of trial.  Hakim described the

development as an 135-140 acre exclusive subdivision with lots that would command a high price. Hakim testified that in 2008 Gilmore solicited a bribe from him by offering to pay $5,000-$10,000 for a large lot that Hakim valued at approximately $175,000. In part, Hakim based his value of the lots in the undeveloped Sherrouse Plantation subdivision on the price of lots in Maison Orleans, another upscale Monroe subdivision developed by the Hakims.

Gilmore responded to Hakim's testimony in two ways. First, he offered his own testimony that he lived very near the Sherrouse Plantation subdivision development, that he was familiar with the area, and that his offer on the lot was a fair value. Second, Gilmore's counsel thoroughly cross-examined Hakim about the price that he paid for the raw land, the fact that the subdivision still had not been developed three years after the alleged bribe, and the fact that he had not sold all the lots in the comparator subdivision.

Since Deshotels' allegations were brought to light, the parties and the Court now know that, in May 2005, the Hakim company, Northeast Realty, sold two key pieces of the Sherrouse Plantation subdivision development to Moses for the same price it had paid in September 2004. The Hakims were aware that Moses wanted to expand the existing trailer park on one piece of property and to build ballfields and concession stands on the other piece of property. Eight months later, in January 2006, Moses sold these same two pieces of property back to the Hakims for the same price. There have been no further transfers of any property in the Sherrouse Plantation subdivision development.

If Defendants had been provided this evidence prior to trial, Gilmore certainly would have used the evidence to attack the Hakims' testimony that the subdivision had been in development since the late 1990s and about the value of the lots in the subdivision. However,

the Court cannot find that Hakim or Joseph Hakim testified "falsely" at trial on this issue. The Hakims had purchased the properties back from Moses two years before Gilmore's offer on a lot in the subdivision. Their testimony about the development plans is not rendered false merely because they deviated from the plans for eight months between May 2005 and January 2006. While Gilmore could have used the sales prices on these two pieces of raw land to and from Moses as evidence of the value of the lot, Gilmore's counsel had already engaged in a rigorous cross-examination of Hakim on this very issue. Evidence of the property transfers to and from Moses may well have been "useful to the defense" to further impeach the Hakims' testimony, but the evidence was "not likely to have changed the verdict," *Giglio*, 405 U.S. at 154, nor is there a "reasonable probability that it would have affected the judgment of the jury." *Wall*, 389 F.3d at 473.

## III.   CONCLUSION

For the foregoing reasons, the Government's Motion to Reconsider [Doc. No. 193] is GRANTED, and Defendants' convictions are reinstated.

MONROE, LOUISIANA, this 29th day of March, 2012.


_____
**ROBERT G. JAMES**
**UNITED STATES DISTRICT JUDGE**